# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF ENVIRONMENTAL
QUALITY,

Plaintiff-Appellee,

v

HERNAN F. GOMEZ and BETHANY M.
GOMEZ,

Defendants-Appellants.

FOR PUBLICATION
November 17, 2016
9:00 a.m.

No. 328033
Ingham Circuit Court
LC No. 13-001426-CE

Before: RIORDAN, P.J., and METER and OWENS, JJ.

PER CURIAM.

Defendants appeal as of right the trial court's judgment—following a grant of summary disposition in favor of plaintiff on the issue of liability and a bench trial on remedies—ordering defendants to remove 1.2 acres of fill material that they placed in a wetland on their property, to restore the area to its previous condition, and to pay a $10,000 civil fine. For the reasons stated below, we affirm.

## I. FACTUAL BACKGROUND

In 2002, defendants purchased approximately 54 acres of property in Green Oak Township, Michigan, with the intention of constructing a home and an adjoining "working ranch" with horses. After building the house, defendants selected an area of land next to it which they decided to convert into a horse pasture. However, in order to make the land suitable for "pasture seed," they believed that "top soil" needed to be added. Accordingly, they placed "fill dirt" in the area between May 2005 and December 2010.

While reviewing aerial photographs in an unrelated matter, Justin Smith, an environmental quality specialist for the Department of Environmental Quality ("DEQ"), happened to notice what "looked like . . . a filled wetland area" on defendants' property. Later, he and Thomas Kolhoff, a district representative for the DEQ and the Water Resources Division ("WRD"), conducted an onsite investigation of defendants' property in fall 2010, during which they sampled the vegetation and the soil, photographed the site, and identified the filled area's boundary. Upon arriving at the property, Smith observed "a cleared area with exposed" light-colored soil, "no vegetation," and "some remnant of remaining wetlands that were not filled" nearby. He specifically observed "a section of cattails 30 feet wide" and "another small section

-1-

that was not filled, that was basically . . . shrub swamp," which "was inundated with approximately six inches of water." Kolhoff performed four or five "soil borings" and attempted to perform more, but he "couldn't get through the fill," which included either "broken concrete or thick gravel."

Smith issued a DEQ "violation notice" on December 2, 2010, which informed defendants that an inspection of their property revealed that "fill material had been placed within wetland regulated under the authority of Part 303" of the Natural Resources and Environmental Protection Act ("NREPA"), and that "it appears that this activity was conducted in violation of Part 303" because the filling was performed without a permit. Smith also told defendants that the WRD "determined that a permit would not have been approved for this project," and that defendants were required bring their property into compliance with Part 303 within 30 days by restoring the site to a wetland. According to defendants, they did not deposit additional fill material on their property once they received the violation notice, but they "continued thereafter to merely plant and nurture pasture grass seed on the land on which fill had already been deposited."

Defendants hired an environmental consulting firm to assist them in the resolution of the alleged violation. In a February 11, 2011 letter, Dianne Martin, "the Director of Resource Assessment and Management" at the firm, informed the WRD that "[a]pproximately 1.4 acres of wetland on the property were filled over the course of the last several years." However, she explained that defendants intended to use the filled area for "farming and ranching activities" and, therefore, were not required to obtain a permit to fill the wetland under the corresponding exemption provided in Part 303 of the NREPA. Nonetheless, Martin indicated that defendants would be willing to enter into a conservation easement for approximately 18 acres of wetland on their property if plaintiff was amenable to such a resolution.

In a letter dated February 18, 2011, Smith informed defendants that the WRD had received Martin's letter and that "the WRD vehemently disagree[d]" that a permit was not required for defendants' activities. Accordingly, he informed defendants that "if the site is not restored . . . this violation may be referred for escalated enforcement action." Subsequently, when Kolhoff visited defendants' property once per year in 2011, 2012, and 2013, and Smith visited the site in March 2013, they each observed that restoration efforts had not begun.

On December 19, 2013, plaintiff initiated an action in the Ingham Circuit Court seeking "injunctive relief to remedy . . . the filling of a wetland without a permit in violation of Part 303 (Wetlands Protection) of the [NREPA]." Plaintiff requested that the court order defendants to restore their property "to the state that existed prior to the unauthorized and unlawful activities" and to pay a civil fine of not more than $10,000 for each day of the Part 303 violation.

In February 2014, defendants moved for summary disposition pursuant to MCR 2.116(C)(8), arguing that they were entitled to judgment as a matter of law because no factual development would alter the fact that their filling of the wetland qualified under Part 303's "farming and ranching exemption," which, in their words, "allows a person to undertake activities that bring a wetland into a previously non-established farming or ranching use" without acquiring a permit. Plaintiff disagreed that the exemption applied. The trial court denied defendants' motion because it determined there were factual issues relevant to whether

-2-

defendants' activities fulfilled the exemption.

In September 2014, defendants again moved for summary disposition, arguing that it was proper under MCR 2.116(C)(7) because the DEQ's action was time-barred under the applicable statute of limitations, as an action for the recovery of a penalty must be brought within two years after the claim accrues. Alternatively, defendants argued that even if a six-year limitations period applies, the action still would be barred because plaintiff's claim accrued when defendants first placed fill material in the wetland in 2005, as established by defendant Hernan's affidavit. Plaintiff DEQ disagreed, arguing that under *Attorney General v Harkins*, 257 Mich App 564; 669 NW2d 296 (2003), the applicable statute of limitations for equitable actions to enforce Part 303 is six years, and it was undisputed that defendants placed fill material in the wetland in 2008, 2009, and 2010. However, plaintiff conceded that it could not seek enforcement for the portion of the wetland that was filled by defendants between 2005 and 2007. After hearing oral argument, the trial court denied defendants' motion, concluding that, under *Harkins*, the six-year statute of limitation applied to plaintiff's claims. The court also held "that each plac[ement] of fill materials or dirt in the wetlands created its own accrual date for the six-year statute of limitations," and that there was no dispute that "this action existed within six years."

In the meantime, plaintiff filed a cross-motion for summary disposition on liability pursuant to MCR 2.116(C)(10), arguing that there was no genuine issue of material fact that defendants placed fill material in a wetland without a permit and that their activities did not constitute "cultivating" under the farming exemption. The trial court granted plaintiff's motion, noting that defendants admitted that they placed fill material in a wetland and that *Huggett v Dep't of Nat Res*, 464 Mich 711; 629 NW2d 915 (2001), "clearly states that filling and dredging a wetland are prohibited activities that do not fit within the farming activities[.]" The court also found defendants' argument that they were cultivating the wetland unpersuasive because "in order to get any potential cultivating [they] had to fill and dredge and had to place materials in the site."

Subsequently, a two-day bench trial was held on the issue of remedies. After hearing testimony from Smith and Kolhoff, both of whom were qualified as expert witnesses, Martin, who also was qualified as an expert witness, and defendant Hernan, the trial court ordered defendants to, *inter alia*, "[r]estore the approximately 1.2 acres of wetlands on [their property] into which fill material was placed after December 19, 2007 . . . to the condition that existed prior to the unauthorized and unlawful placement of fill material." The restoration activities ordered by the court were as follows:

a. Remove all fill material from the restoration area described above;

b. After the fill material is removed, address compaction of the wetland soils in the restoration area to allow the soils to return to the original grade;

c. Re-establish wetland vegetation in the restoration area by applying a DEQ-approved native wetland plant seed mix and planting native Michigan species of wetland shrubs;

d. Monitor the restoration area for five years after the date of completion; and

e. Implement invasive species monitoring and control measures in the restoration area for five years after the date of completion.

Before commencing the restoration, defendants were required to prepare and submit a restoration plan to plaintiff no later than June 30, 2016. The trial court also ordered defendants to pay a civil fine of $10,000.

## II. WHETHER DEFENDANTS' CONDUCT QUALIFIES AS A "FARMING" OR "RANCHING" ACTIVITY

Defendants argue that the trial court erroneously granted summary disposition in favor of plaintiff because their use of fill dirt to create a pasture was exempt as a farming or ranching activity from the wetland permitting requirements. We disagree.

## A. STANDARD OF REVIEW

This Court reviews *de novo* a trial court's grant or denial of summary disposition. *Moraccini v Sterling Hts*, 296 Mich App 387, 391; 822 NW2d 799 (2012). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Cannon Twp v Rockford Pub Sch*, 311 Mich App 403, 411; 875 NW2d 242 (2015). When reviewing such a motion, this Court may only consider, in the light most favorable to the party opposing the motion, the evidence that was before the trial court, which consists of "the 'affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties.' " *Calhoun Co v Blue Cross Blue Shield Michigan*, 297 Mich App 1, 11; 824 NW2d 202 (2012), quoting MCR 2.116(G)(5). Under MCR 2.116(C)(10), "[s]ummary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

Questions of statutory interpretation are also reviewed *de novo*. *Stanton v City of Battle Creek*, 466 Mich 611, 614; 647 NW2d 508 (2002).

> When construing statutes, our primary task is to discern and give effect to the Legislature's intent. We begin by examining the statutory language, which provides the most reliable evidence of that intent. If the statutory language is clear and unambiguous, then we conclude that the Legislature intended the meaning it clearly and unambiguously expressed, and the statute is enforced as written. No further judicial construction is necessary or permitted. [*Huggett v Dep't of Nat Res*, 464 Mich 711, 717; 629 NW2d 915 (2001).]

"Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013). Additionally, "[w]hen construing a statute, a court must read it as a whole." *Klooster v City of Charlevoix*, 488 Mich 289, 296; 795 NW2d 578 (2011).

B. ANALYSIS

The Natural Resources and Environmental Protection Act ("NREPA"), MCL 324.101 *et seq.*, "is a comprehensive statutory scheme containing numerous parts, all intended to protect the environment and natural resources of this state." *People v Schumacher*, 276 Mich App 165, 171; 740 NW2d 534 (2007). Part 303 of the act, MCL 324.30301 *et seq.*, "governs activities in wetlands." *Huggett*, 464 Mich at 715.[1] "At the federal level, the Clean Water Act (CWA) provides for the regulation and protection of wetlands, while Michigan's wetland protection act . . . serves the same purpose for this state." *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523, 530; 705 NW2d 365 (2005) (citation omitted).

MCL 324.30304 states:

Except as otherwise provided in this part or by a permit issued by the department[,[2]] . . . a person shall not do any of the following:

(a) Deposit or permit the placing of fill material in a wetland.

(b) Dredge, remove, or permit the removal of soil or minerals from a wetland.

(c) Construct, operate, or maintain any use or development in a wetland.

(d) Drain surface water from a wetland. [MCL 324.30304(a)-(d).]

"Fill material" is defined as "soil, rocks, sand, waste of any kind, or any other material that displaces soil or water or reduces water retention potential." MCL 324.30301(1)(d). "However, part 303 also provides that certain activities are not subject to § 30304's prohibitions." *Huggett*, 464 Mich at 715. In particular, MCL 324.30305(2) provides that, unless otherwise precluded by other state laws or "the owner's regulation," certain uses are allowed in a wetland without a permit. Defendants maintain that their filling of the wetland and subsequent growing of pasture grass are activities that fall under the exemption in MCL 324.30305(2)(e). During the time period relevant to this case,[3] MCL 324.30305(2)(e) provided that the following activities could

---

[1] Part 303 is sometimes referred to as "the wetland protections act" or "the wetlands protection act." See, e.g., *People v Taylor*, 495 Mich 923; 844 NW2d 707 (2014) (MARKMAN, J., concurring); *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523, 530; 705 NW2d 365 (2005); *Huggett v Dep't of Nat Res*, 232 Mich App 188, 191; 590 NW2d 747 (1998), aff'd 464 Mich 711 (2001). See also *Huggett*, 464 Mich at 715 n 1.

[2] The DEQ has "the authority, powers, duties, functions, and responsibilities under" the relevant provisions of the NREPA. Executive Order No. 2011-1.

[3] The farming activities exemption was amended by 2013 PA 98, effective July 2, 2013, which added a subsection stating, in part, that "[b]eginning October 1, 2013, to be allowed in a wetland without a permit, these activities shall be part of an established ongoing farming[] [or] ranching . . . operation." MCL 324.30305(2)(e)(*i*).

be conducted in a wetland without a permit:

> Farming, horticulture, silviculture, lumbering, and ranching activities, including plowing, irrigation, irrigation ditching, seeding, *cultivating*, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices. Wetland altered under this subdivision shall not be used for a purpose other than a purpose described in this subsection without a permit from the department. [MCL 324.30305(2)(e), as amended by 1995 PA 59 (emphasis added).]

In particular, defendants contend that their activities constituted "prepar[ation] and cultivat[ion of] the field for farming and ranching use," so that their filling and cultivation of the wetland qualified under the exemption for farming- and ranching-related activities.

In *Huggett*, 464 Mich at 718-722, the Michigan Supreme Court interpreted the former version of the "farming activities exemption" at issue in this appeal. See *id*. at 718. Other than the opinion issued by this Court before the Supreme Court's opinion in *Huggett*, see *Huggett v Dep't of Nat Res*, 232 Mich App 188, 191; 590 NW2d 747 (1998), aff'd 464 Mich 711 (2001), we have found no other authority interpreting the "farming activities exemption." While we recognize the factual distinctions between *Huggett* and the instant case, we believe that the reasoning utilized by the *Huggett* Court is directly applicable to the circumstances of this case.

In *Huggett*, the plaintiffs sought to build a 200-acre cranberry farm on a 325-acre parcel of land, which included 278 acres of wetland. *Id*. at 713. In order to build the farm, the plaintiffs proposed "placing fill material in wetland areas, excavating and removing soil from wetland areas, building dikes and culverts; digging irrigation ditches; and constructing a reservoir and pumping station, roads, and an airstrip." *Id*. The plaintiffs maintained in the trial court and on appeal that their proposed activities qualified under the farming activities exemption and were not, therefore, "subject to the wetland permit requirements[.]" *Id*. at 713-

---

While not directly relevant to the issues raised on appeal in this case, there appears to be some confusion regarding the effect of 2013 PA 98 that merits discussion. The "[e]nacting section 2" of 2013 PA 98 states as follows:

> Part 303 of the natural resources and environmental protection act, 1994 PA 451, MCL 324.30301 to 324.30327, is repealed effective 160 days after the effective date, as published in the federal register, of an order by the administrator of the United States environmental protection agency under 40 CFR 233.53(c)(8)(vi) withdrawing approval of the state program under 33 USC 1344(g) and (h).

In *Dep't of Environmental Quality v Morley*, 314 Mich App 306, 308 n 1; 885 NW2d 892 (2015), this Court noted that "Part 303 was repealed by 98 PA 2013." However, a close reading of the enacting section confirms that 2013 PA 98 did not repeal Part 303, but merely provided that the part *will be* repealed in the event that the EPA withdraws approval of Michigan's program. Indeed, the Legislature amended various sections of Part 303 through 2013 PA 98 and expressly repealed MCL 324.30325. It would be nonsensical for the Legislature to make amendments to Part 303 and also repeal it in the same act.

714. The plaintiffs argued that the list of exempt farming activities under MCL 324.30305(2)(e) was not exhaustive, contending that "[t]he farming activities exemption . . . includes all of the activities necessary for farming." *Id*. at 718 (quotation marks omitted).

The Michigan Supreme Court, however, concluded that "[t]hese specific examples of farming activities [under MCL 324.30305(2)(e)] relate to the operation, improvement, expansion, and maintenance of a farm, or to the actual practice of farming." *Id*. at 719. Accordingly, although activities not specifically listed in the statute may be covered by the farming activities exemption, "[u]nder the canon of ejusdem generis,[4] . . . the activities must be of the kind, class, character, or nature of operating a farm or practicing farming." *Id*. at 719. Notably, in "constru[ing] both the prohibitions and exemptions in part 303 to make both viable," *Huggett*, 464 Mich at 717, the Court recognized that "some of the activities allowed under § 30305 overlap with the activities prohibited under § 30304," *Huggett*, 464 Mich at 720. The Court cited, as an example, MCL 324.30304's prohibition of draining and MCL 324.30305's allowance of "minor drainage." *Huggett*, 464 Mich at 720. "To make both sections viable," the Court reasoned, "we must read the allowance for minor drainage only to allow drainage that fits within the definition of 'minor drainage,' or, in other words, only to allow drainage that is inconsequential." *Id*.

Ultimately, the Supreme Court found that "[t]he activities [the] plaintiffs seek to exempt . . . are not in the kind, class, character, or nature of operating a farm." *Id*. More specifically, it later reiterated that the "[p]laintiffs' proposed activities unquestionably amount to more than 'minor drainage' *and also entail filling* and dredging in a wetland, *which are prohibited activities*. These activities, then, do not fit within the farming activities exemption to the wetland permit requirements." *Id*. (emphasis added). Based on this reasoning, we conclude that defendants' acts of filling the wetland in this case were prohibited acts that did not fall under the farming activities exemption. See *id*.

However, we recognize that the specific question raised by defendants in this appeal differs, to a certain extent, from the question raised in *Huggett*. Here, defendants conceptualize the issue as whether the placement of fill material in a wetland in order to grow grass thereon constitutes " 'cultivating' the land, as that term is used in Part 303," or is at least "of 'the same kind, character or nature' as cultivating, as allowed by *Huggett*." Stated differently, we understand defendants' claim as arguing, in essence, that their placement of fill material constitutes "cultivating" under MCL 324.30305(2)(e) and is, therefore, a limited exception to the prohibition against filling in MCL 324.30304(a), similar to the way that "minor drainage" under MCL 324.30305(2)(e) is a limited exception to the prohibition against draining surface water from a wetland in MCL 324.30304(2)(d). We disagree that defendants' act of adding fill material to the wetland constitutes "cultivating," or something similar to cultivation, which is exempted from the permit requirements pursuant to MCL 324.30305(2)(e).

---

[4] The canon of ejusdem generis restricts "the general term . . . to include only things of the same kind, class, character, or nature as those specifically enumerated." *Huggett*, 464 Mich at 718-719.

"Cultivating" is not defined for purposes of Part 303 or elsewhere in the NREPA. See MCL 324.30301. Accordingly, it is appropriate to consult a dictionary to determine its plain and ordinary meaning. *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 529; 872 NW2d 412 (2015). *Merriam-Webster's Collegiate Dictionary* (11th ed) defines "cultivate" as "to prepare or prepare and use for the raising of crops", "to loosen or break up the soil about (growing plaints)," "to foster the growth of [vegetables]," and "to improve by labor, care, or study." Based on these definitions, it appears that the plain and ordinary meaning of "cultivating" involves preparing, improving, or tilling soil already present in a given growing area, and all of these activities are of the "kind, class, character, or nature of operating a farm or practicing farming." See *Huggett*, 464 Mich at 719. Accordingly, we conclude that defendants' extensive depositing of dirt in the area does not fulfill the plain and ordinary meaning of "cultivating," as defendants' actions were not intended to accomplish any of those goals.

Additionally, we acknowledge, without deciding, that it is possible that some actions that may appear at first glance to constitute "filling" prohibited under § 30304 could be permitted as "cultivating" under the farming activities exemption. In particular, defendants argue that the placement of manure on farmland constitutes filling, but would be allowed as a farming activity under MCL 324.30305(2)(e). Notably, however, "fill material" is defined for purposes of Part 303 as "soil, rocks, sand, waste of any kind, or any other material *that displaces soil or water or reduces water retention potential.*" MCL 324.30301(1)(d) (emphasis added). To resolve the overlap between MCL 324.30304 and MCL 324.30305 concerning draining, the *Huggett* Court applied "a balanced reading" of those sections to only allow "*inconsequential* draining" to be conducted without permit. *Id*. at 720 (emphasis added). Analogously, we conclude that even if "cultivating" may encompass some *limited* placement of fill material in a wetland, this permitted act must be balanced with the express prohibition of fill materials which displace water or soil or reduce the wetland's ability to retain water. See MCL 324.30301(1)(d); MCL 324.30304(a); MCL 324.30305(2)(e).

Accordingly, although placing certain materials, such as manure, on a wetland in order to cultivate the land may qualify under the farming activities exemption, we cannot conclude that defendant's extensive placement of soil and other materials in this case qualifies under the exemption, especially given the definition of "fill material" in MCL 324.30301(1)(d). It is apparent from the documentary evidence in the record that there was no genuine issue of material fact that defendants' extensive filling of the approximately 1.6-acre area[5] was distinct from activities routinely performed in "the operation, improvement, expansion, and maintenance of a farm [or ranch], or to the actual practice of farming [or ranching]," see *Huggett*, 464 Mich at 719, especially because it *completely changed* the character of the vast majority of that 1.6-acre area so that it is now an upland meadow surrounded by wetland, except for the very small portions of the area that still qualify as wetland despite the filling.[6] See *Allison*, 481 Mich at

---

[5] As further discussed *infra*, the trial court concluded that only 1.2 acres of the total area filled was subject to relief under the statute of limitations.

[6] There is no dispute that the filled area was no longer a wetland. However, the parties dispute the effect of the filling on the entire 145-acre wetland complex.

425; *Calhoun*, 297 Mich App at 11. Cf. MCL 324.30305(2)(e), as amended by 2012 PA 247 (now MCL 324.30305(2)(e)(*iii*)) ("Wetland *altered* under this subdivision shall not be used for a purpose other than a purpose described in this subsection without a permit from the department".) (emphasis added).

Thus, we find that the trial court correctly determined that defendants' filling activities required a permit and properly granted summary disposition in favor of plaintiff pursuant to MCR 2.116(C)(10).[7]

## III. STATUTE OF LIMITATIONS

Defendants argue that the trial court erred by denying their motion for summary disposition pursuant to MCR 2.116(C)(7) because plaintiff's complaint was barred by both the applicable statute of limitations and the doctrine of laches. We disagree.

## A. STANDARD OF REVIEW

This Court reviews *de novo* both the applicability of a statute of limitations, *Attorney Gen v Harkins*, 257 Mich App 564, 569; 669 NW2d 296 (2003), and the trial court's ruling on a motion for summary disposition, *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). "Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed facts establish that the plaintiff's claim is barred under the applicable statute of limitations." *Kincaid*, 300 Mich App at 522. "Generally, the burden is on the defendant who relies on a statute of limitations defense to prove facts that bring the case within the statute." *Id*.

> When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [*Dextrom v Wexford Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010) (citations omitted).]

---

[7] For similar reasons, the trial court properly denied defendants' earlier motion for summary disposition pursuant to MCR 2.116(C)(8). See *Diallo v LaRochelle*, 310 Mich App 411, 414; 871 NW2d 724 (2015) ("A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a complaint.") (quotation marks and citation omitted); *Diem v Sallie Mae Home Loans, Inc*, 307 Mich App 204, 210; 859 NW2d 238 (2014) ("Summary disposition under MCR 2.116(C)(8) is appropriate where the complaint fails to state a claim on which relief may be granted.") (quotation marks and citation omitted).

B. ANALYSIS

1. APPLICABLE STATUTE OF LIMITATIONS

Pursuant to MCL 324.30315(1):

> If, on the basis of information available to the department [of environmental quality], the department finds that a person is in violation of this part or a condition set forth in a permit issued under section 30311 or 30312, the department shall issue an order requiring the person to comply with the prohibitions or conditions or the department shall request the attorney general to bring a civil action under section 30316(1).

Under MCL 324.30316(1), if the department so requests, "[t]he attorney general may commence a civil action for appropriate relief, including injunctive relief[.]"  The NREPA does not provide a statute of limitations for enforcement actions. *Harkins*, 257 Mich App at 570.

"Statutes of limitations are found at Chapter 58 of the Revised Judicature Act (RJA), MCL 600.5801 *et seq.*" *Peabody v DiMeglio*, 306 Mich App 397, 404; 856 NW2d 245 (2014). In *Harkins*, 257 Mich App at 569-570, we concluded that the attorney general's civil action seeking restoration of a wetland following violations of Part 303 of the NREPA "comes within the meaning of a 'personal action' as defined in [MCL 600.]5813" for two reasons:  "it seeks to 'repair some loss,' " and "[a]ctions brought by the Attorney General on behalf of government departments are deemed personal actions."  (Citation omitted.)  MCL 600.5813 provides that "[a]ll other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes."  Accordingly, given the absence of a statute of limitations in the NREPA, we reasoned:

> While MCL 324.30316 provides for the commencement of a civil action by the Attorney General to seek "appropriate relief, including injunctive relief" for permit violations, it does not state a period of limitations for bringing such actions.  The Revised Judicature Act specifies that § 5813 is the general statute of limitations applying to "[a]ll other personal actions . . . unless a different period is stated in the statutes."  This Court has held that "a civil cause of action arising from a statutory violation is subject to the six-year limitation period found in § 5813, if the statute itself does not provide a limitation period." *DiPonio Constr Co v Rosati Masonry Co, Inc*, 246 Mich App 43, 56; 631 NW2d 59 (2001).  There being no period of limitations expressly applicable to actions brought under the NREPA, the general limitation provisions of § 5813 apply. [*Harkins*, 257 Mich App at 570-571.]

Thus, we concluded that the six-year statute of limitations under MCL 600.5813 applied to plaintiff's civil action against the defendant, which sought restoration of the wetland. *Id*. at 570-572.

Defendants attempt to distinguish *Harkins* from this case, emphasizing that *Harkins* only addressed § 5813's application to equitable actions and the *Harkins* Court was not confronted with the argument that MCL 600.5809(2) applies to claims for civil penalties.  However, MCL

-10-

600.5815 states, in relevant part, that "[t]he prescribed period of limitations shall apply equally to all actions whether equitable or legal relief is sought." MCL 600.5815. See also *Harkins*, 257 Mich App at 570 n 3 (quoting MCL 600.5815). Thus, even though *Harkins* focused on the period of limitations for equitable relief, under MCL 600.5815, the limitation period for an action does not hinge on the type of relief sought. Therefore, a necessary implication of *Harkins* is that all enforcement actions under Part 303 are governed by the six-year period of limitations under MCL 600.5813. Moreover, in *Harkins*, 257 Mich App at 568, the DEQ was seeking civil fines in addition to a restoration order, the same relief that plaintiff sought in this case. Thus, we reject defendants' claim that *Harkins* is distinguishable and apply the holding therein as binding precedent. See MCR 7.215(C)(2), (J)(1).

Further, even assuming, arguendo, that *Harkins* is not controlling, defendants' argument that MCL 600.5809(2) is the correct statute of limitations has no merit. MCL 600.5809(2) provides, "The period of limitations is 2 years for an action for the recovery of a penalty or forfeiture based on a penal statute brought in the name of the people of this state." Defendants characterize the instant action as being "based on a penal statute brought in the name of the people of this state" because a state agency, the DEQ, has brought this action through the attorney general and is seeking a penalty. However, the Michigan Supreme Court has recognized that MCL 600.5809(2) "applies in the criminal context," meaning that it "applies only to civil forfeiture actions based on a penal statute." *People v Monaco*, 474 Mich 48, 55; 710 NW2d 46 (2006). No criminal statute or criminal action brought in the name of the people of this state is at issue here.[8] Further, when viewed in context, it is clear that the phrase "an action for the recovery of a penalty or forfeiture" refers to an action to recover a penalty or forfeiture that *already has been assessed*, *i.e.*, a noncontractual money obligation, not an action to *impose* a penalty. See *Sweatt v Dep't of Corrections*, 468 Mich 172, 179-180; 661 NW2d 201 (2003) (stating that statutory terms are not construed in a vacuum; rather, they must be read in context). Accordingly, we reject defendants' claim that the statute of limitations under MCL 600.5809(2) is applicable here.[9]

---

[8] Although there are provisions providing for criminal liability under MCL 324.30316, defendants were not held criminally liable in this case.

[9] We also reject defendants' reliance on the Michigan Department of Environmental Quality Land and Water Management Division Compliance and Enforcement Guidance Manual, which was proffered in the trial court, as a "guideline" that is binding on plaintiff with regard to the applicable statute of limitations. As explained *supra*, we recognized in *Harkins*—which was decided more than two years after the manual was issued, according to trial testimony and the date on the manual's cover—that the NREPA does not include a statute of limitations for enforcement actions and "the general limitation provisions of § 5813 apply."

Further, there is no indication that the manual constitutes a "guideline" that is binding on the agency pursuant to MCL 24.203(7) (formerly MCL 24.203(6)). This Court has recognized that in order to promulgate a guideline under the Administrative Procedures Act, the agency must follow a specific procedure. See *In re Pub Serv Com'n for Transactions Between Affiliates*, 252 Mich App 254, 265; 652 NW2d 1 (2002); *Faircloth v Family Indep Agency*, 232 Mich App

## 2. PLAINTIFF'S COMPLIANCE WITH THE STATUTE OF LIMITATIONS

Next, defendants contend that even if the six-year statute of limitations under MCL 600.5813 applies, plaintiff's complaint is barred because its claim accrued more than six years before the complaint was filed in December 2013. We reject defendants' argument.

MCL 600.5827 provides, "Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues." Generally, a "claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." *Id*. Plaintiff filed suit on December 19, 2013, and conceded in the trial court that it was time-barred from seeking enforcement of any violation occurring between 2005 and 2007. The trial court limited its judgment accordingly, ordering defendants to restore the 1.2 acres of wetland "into which fill material was placed after December 19, 2007."

However, defendants maintain that plaintiff's claim accrued in 2005 when they *first* placed fill dirt in the wetland, and they suggest that allowing plaintiff to enforce violations that occurred after 2007 invokes the "continuing violations" doctrine—also known as the "continuing tort" or "continuing wrong" doctrine—which was abrogated by *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 284; 696 NW2d 646 (2005), amended 473 Mich 1205 (2005). We disagree.

Under the continuing violations doctrine, "[w]here a defendant's wrongful acts are of a continuing nature, the period of limitation will not run until the wrong is abated; therefore, a separate cause of action can accrue each day that defendant's tortious conduct continues." *Harkins*, 257 Mich App at 572 (quotation marks and citation omitted; alteration in original); see also *Garg*, 472 Mich at 278-282. However, the Michigan Supreme Court has concluded that "the 'continuing violations' doctrine is contrary to Michigan law" and "has no continued place in the jurisprudence of this state." *Garg*, 472 Mich at 284, 290. Even though *Garg* was a discrimination case involving a three-year statute of limitations, "[t]he holding of *Garg* does not appear limited to discrimination cases; rather, the Court applied the plain text of the limitations and accrual statutes" in this state. *Terlecki v Stewart*, 278 Mich App 644, 655; 754 NW2d 899

391, 403 n 6; 591 NW2d 314 (1998), citing MCL 24.203(6) (now MCL 24.203(7)) and MCL 24.224. Defendants have provided no evidence that such a process was followed before the manual was issued here, and we have found no indication that such a process was followed. See MCL 24.224. Rather, the relevant documents suggest that the contrary is true. The manual explains, "This manual describes the process and procedure for the Land and Water Management Division enforcement and compliance program, and implements the Department of Environmental Quality Compliance and Enforcement Policy, 04-003," and a revised version of DEQ Compliance and Enforcement Policy 04-003 states at the top, "This document is intended to provide guidance to staff to foster consistent application of the DEQ's compliance and enforcement processes and procedures. *This document is not intended to convey any rights to any person nor itself create any duties or responsibilities under the law.* This document and matters addressed herein are subject to revision." (Emphasis added.) Further, Smith testified at trial that the DEQ division that promulgated the manual no longer exists, and that the manual is no longer in use by the DEQ.

(2008). Accordingly, we have held that the continuing violations doctrine is no longer viable in Michigan. See *Rusha v Dept of Corr*, 307 Mich App 300, 313 n 9; 859 NW2d 735 (2014); *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 285-286; 769 NW2d 234 (2009); *Terlecki*, 278 Mich App at 655.

At first glance, it may appear that plaintiff's claims in this case are based on the now-overruled doctrine. However, an examination of *Garg* reveals that plaintiff's claims were not based on that doctrine.

In *Garg*, the plaintiff filed suit in 1995 claiming unlawful retaliation under the Civil Rights Act, MCL 37.2101 *et seq*. *Garg*, 472 Mich at 270. She alleged, among other things, that she was denied multiple promotions after filing a grievance in 1987. *Id*. at 270, 277. The Court reasoned that MCL 600.5805, which sets forth the statute of limitations for tort actions, and MCL 600.5827, which pertains to claim accrual, do not "permit[] a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as 'continuing violations.' To allow recovery for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature." *Id*. at 281-282. The Court held "that a person must file a claim under the [CRA] within three years of the date his or her cause of action accrues, as required by § 5805(10)." *Id*. at 284. Applying the three-year statute of limitations to the plaintiff's claims in *Garg*, the Court ruled that "plaintiff's claims of retaliatory discrimination arising from acts occurring before June 21, 1992, are untimely and cannot be maintained." *Id*. at 286.

Thus, under *Garg*, each alleged violation of the statute was a separate claim with a separate time of accrual. This Court came to the same conclusion in *Tarlecki*, explaining that, under *Garg*, whether a claim is timely is determined by the statute of limitations applicable to that claim, and that a "claim accrue[s] '[e]xcept as otherwise expressly provided . . . at the time the wrong upon which the claim is based was done regardless of the time when damage results.' " *Tarlecki*, 278 Mich App at 657, quoting MCL 600.5827. As such, the fact that some of a plaintiff's claims accrued outside the applicable limitation period does not time-bar all of the plaintiff's claims. See *Garg*, 472 Mich at 286; *Tarlecki*, 278 Mich App at 657-658.

Here, defendants violated Part 303 each time they deposited fill material in the wetland. See MCL 324.30304(a). Thus, even though plaintiff could not seek enforcement of the violations that occurred before December 19, 2007, it was not barred from initiating an enforcement action for the violations that occurred within the limitations period. Thus, the trial court properly concluded that plaintiff's claims arising from acts occurring after December 19, 2007, were not time-barred.

### 3. DOCTRINE OF LACHES

Lastly, defendants argue that the doctrine of laches bars plaintiff's claims. We disagree.

"The doctrine of laches is triggered by the plaintiff's failure to do something that should have been done under the circumstances or failure to claim or enforce a right at the proper time." *Attorney Gen v PowerPick Club*, 287 Mich App 13, 51; 783 NW2d 515 (2010). However, the doctrine is only "applicable in cases in which there is an unexcused or unexplained delay in

commencing an action and a corresponding change of material condition that results in prejudice to a party." *Pub Health Dep't v Rivergate Manor*, 452 Mich 495, 507; 550 NW2d 515 (1996). See also *Knight v Northpointe*, 300 Mich App 109, 114; 832 NW2d 439 (2013) ("If a plaintiff has not exercised reasonable diligence in vindicating his or her rights, a court sitting in equity may withhold relief on the ground that the plaintiff is chargeable with laches."); *Tenneco Inc v Amerisure Mut Ins Co*, 281 Mich App 429, 457; 761 NW2d 846 (2008) ("For laches to apply, inexcusable delay in bringing suit must have resulted in prejudice."). "The defendant has the burden of proving that the plaintiff's lack of due diligence resulted in some prejudice to the defendant." *Twp of Yankee Springs v Fox*, 264 Mich App 604, 612; 692 NW2d 728 (2004). The Michigan Supreme Court previously stated that when a party files their claim within the relevant period of limitation, "any delay in the filing of the complaint was presumptively reasonable, and the doctrine of laches is simply inapplicable." *Michigan Ed Employees Mut Ins Co v Morris*, 460 Mich 180, 200; 596 NW2d 142 (1999). But this Court has held that courts may apply the doctrine of laches to bar actions at law, even when the statute of limitations established by the Legislature has not expired. *Tenneco*, 281 Mich App at 457.

In this case, it is likely that plaintiff did not "exercise[] reasonable diligence" in pursuing its rights.[10] See *Knight*, 300 Mich App at 114. However, defendants have not identified any prejudice that would justify application of the doctrine of laches. See *Yankee Springs*, 264 Mich App at 612. Defendants assert that due to plaintiff's delay, the filled area is now "a cultivated and stabilized field of pasture grass." However, they do not explain how the presence of a stabilized field of pasture grass demonstrates that *plaintiff's delay caused* "a corresponding *change of material condition* that result[ed] in prejudice to [defendants]." *Rivergate Manor*, 452 Mich at 507 (emphasis added); see also *Twp of Yankee Springs*, 264 Mich App at 612. For example, they identify no additional expense or harm that they have incurred, or that they will incur, related to the pasture grass that has resulted exclusively from plaintiff's delay. Instead, they essentially argue that laches should apply because the area was successfully converted into something of a different nature during the period of plaintiff's delay. Cf. *PowerPick Club*, 287 Mich App at 51 ("The defense, to be raised properly, must be accompanied by a finding that the delay caused some prejudice to the party asserting laches and that it would be inequitable to ignore the prejudice so created."). Moreover, defendants had notice from plaintiff that it may assert its rights at any time, and they continued growing pasture grass on the field at their own risk.

Most importantly, however, defendants are not entitled to assert the equitable defense of laches because they came before the trial court with unclean hands. *PowerPick Club*, 287 Mich

---

[10] Plaintiff sent a violation notice to defendants in December 2010 and ordered them to restore the area within 30 days, or within a time frame mutually agreed upon by the parties. After defendants asserted that they were exempt from the wetland permitting requirements, plaintiffs warned defendants in February 2011 that "if the site is not restored, . . . this violation may be referred for escalated enforcement action." Subsequently, one of plaintiff's employees visited the property once a year in 2011, 2012, and 2013, and observed that restoration efforts had not begun. It is unclear why plaintiff waited until the end of 2013 to file an enforcement action.

App at 50-52. "Our Supreme Court has observed that a party who has 'acted in violation of the law' is not 'before a court of equity with clean hands,' and is therefore 'not in position to ask for any remedy in a court of equity.'" *Id*. at 52. As explained earlier in this opinion, defendants violated Part 303 of the NREPA each time they deposited fill material in the wetland. See MCL 324.30304(a). Thus, the trial court properly concluded that the doctrine of laches does not bar plaintiff's claim in this case.

## IV. RESTORATION RULING

Next, defendants contend that the trial court erred in ordering them to restore the area of the wetland on which fill material was deposited after December 19, 2007. We disagree.

### A. STANDARD OF REVIEW

The parties do not dispute that "the trial court's factual findings are reviewed for clear error." *Canjar v Cole*, 283 Mich App 723, 727; 770 NW2d 449 (2009). "A finding of fact is clearly erroneous when no evidence supports the finding or, on the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *King v Michigan State Police Dep't*, 303 Mich App 162, 185; 841 NW2d 914 (2013). However, the parties dispute the standard of review applicable to the trial court's restoration order in light of contradictory caselaw. Defendants assert that a restoration order constitutes equitable relief that is reviewed *de novo*, while plaintiff argues that a restoration order is injunctive relief that is reviewed for an abuse of discretion. We agree with plaintiff.

First, the applicable statute affords the trial court significant discretion in fashioning a remedy for a violation of Part 303. MCL 324.30316(4) provides:

> In addition to the penalties provided under subsections (1), (2), and (3), the court *may* order a person who violates this part to restore as nearly as possible the wetland that was affected by the violation to its original condition immediately before the violation. The restoration *may* include the removal of fill material deposited in the wetland or the replacement of soil, sand, or minerals. [Emphasis added.]

"[T]he term 'may' presupposes discretion and does not mandate an action." *In re Weber Estate*, 257 Mich App 558, 562; 669 NW2d 288 (2003). Accordingly, when "may" is used in the statute or court rule authorizing the action at issue, "review for an abuse of discretion is appropriate." *Detroit Edison Co v Stenman*, 311 Mich App 367, 385 n 8; 875 NW2d 767 (2015).

Likewise, based on the relevant caselaw, we agree with plaintiff that the abuse of discretion standard applicable to injunctive relief is the applicable standard of review for the trial court's restoration ruling. We previously recognized that an order to restore a wetland "is essentially a mandatory injunction that historically has been considered an equitable remedy[.]" *People v Keeth*, 193 Mich App 555, 562; 484 NW2d 761 (1992). Both this Court and the Michigan Supreme Court have repeatedly stated that a trial court's decision to grant injunctive relief is reviewed for an abuse of discretion. See, e.g., *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008); *Martin v Murray*, 309 Mich App 37, 45; 867 NW2d 444 (2015); *Janet Travis, Inc v Preka Holdings, LLC*, 306 Mich App 266, 274; 856

NW2d 206 (2014).[11] "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 273; 761 NW2d 761 (2008).

## B. ANALYSIS

As onerous as the remedy may seem, the trial court did not abuse its discretion when it ordered defendants to restore the filled area.

---

[11] Other cases have indicated that a trial court's imposition of an injunction is reviewed *de novo*. See, e.g., *Williamstown Twp v Hudson*, 311 Mich App 276, 289; 874 NW2d 419 (2015). The confusion seems to arise from the fact that an injunction is an equitable remedy, see *Terlecki*, 278 Mich App at 663, and the fact that equitable relief is generally reviewed *de novo*, *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008) ("When reviewing a grant of equitable relief, an appellate court will set aside a trial court's factual findings only if they are clearly erroneous, but whether equitable relief is proper under those facts is a question of law that an appellate court reviews de novo.").

However, we located no recent Michigan Supreme Court cases indicating that a trial court's imposition of an injunction is reviewed *de novo*. The most recent Supreme Court case that we could find that seemed to even suggest *de novo* review was *School District for City of Holland, Ottawa & Allegan Cos v Holland Ed Ass'n*, 380 Mich 314, 319; 157 NW2d 206 (1968). And, in reviewing the caselaw as a whole, it is clear that injunctive relief is carved out from the general rule that equitable relief is reviewed *de novo* and is, instead, reviewed for an abuse of discretion. See *Pontiac Fire Fighters*, 482 Mich at 8; *Michigan Coal of State Employee Unions v Michigan Civil Serv Com'n*, 465 Mich 212, 217; 634 NW2d 692 (2001); *Martin*, 309 Mich App at 45; *Barrow v Detroit Election Com'n*, 305 Mich App 649, 662; 854 NW2d 489 (2014) ("We review for an abuse of discretion a circuit court's decision whether to grant injunctive relief."); *Wayne Co Retirement Sys v Wayne Co*, 301 Mich App 1, 25; 836 NW2d 279 (2013) ("The decision whether to grant injunctive relief is discretionary, although equitable issues are generally reviewed de novo, with underlying factual findings being reviewed for clear error."), vacated in part on other grounds 497 Mich 36 (2014); *Cipri v Bellingham Frozen Foods, Inc*, 235 Mich App 1, 9; 596 NW2d 620 (1999).

Notably, we acknowledged the competing standards of review in *Cipri*, 235 Mich App at 9, while reviewing a trial court's denial of a request for a restoration order under the Michigan Environmental Protection Act ("MEPA"):

> Lastly, equitable issues are reviewed de novo, although the findings of fact supporting the decision are reviewed for clear error. *Webb v Smith (After Remand)*, 204 Mich App 564, 568; 516 NW2d 124 (1994). However, "[t]he granting of injunctive relief is within the sound discretion of the trial court, although the decision must not be arbitrary and must be based on the facts of the particular case." *Holly Twp v Dep't of Natural Resources*, 440 Mich 891[, 891; 487 NW2d 753] (1992); see also *Wayne Co Dep't of Health v Olsonite Corp*, 79 Mich App 668; 699-700, 706-707; 263 NW2d 778 (1977).

We ultimately determined that "the trial court *did not abuse its discretion* in denying plaintiff's claim for equitable relief under the MEPA." *Cipri*, 235 Mich App at 10 (emphasis added).

1. TRIAL COURT'S FINDINGS AND REASONING

"Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there is a real and imminent danger of irreparable injury." *Janet Travis, Inc*, 306 Mich App at 274. We consider the following factors in determining whether a trial court abused its discretion by issuing a permanent injunction:

> (a) the nature of the interest to be protected, (b) the relative adequacy to the plaintiff of injunction and of other remedies, (c) any unreasonable delay by the plaintiff in bringing suit, (d) any related misconduct on the part of the plaintiff, (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied, (f) the interests of third persons and of the public, and (g) the practicability of framing and enforcing the order or judgment. [*Id*. (quotation marks and citation omitted).]

See also *Kernen v Homestead Dev Co*, 232 Mich App 503, 514; 591 NW2d 369 (1998). Additionally, "[c]ourts balance the benefit of an injunction to a requesting plaintiff against the damage and inconvenience to the defendant, and will grant an injunction if doing so is most consistent with justice and equity." *Id*. at 274-275.

A close examination of the trial court's findings reveals that the court took into consideration—albeit not explicitly—these factors in determining that restoration of the wetland was warranted. Accordingly, for the reasons explained below, the trial court's reasoning and conclusion were not outside the range of principled outcomes. See *Ypsilanti Charter Twp*, 281 Mich App at 273.

The trial court first stated that it was not persuaded that the area at issue was in the process of returning to a wetland. The court based this finding on its review of photographs proffered by both parties during the trial, particularly photographs clearly showing that defendants had filled the site and that pasture grass had been planted—two facts never disputed by defendants. Additionally, Martin had testified that only 0.4 acres of the area, at most, would revert back to wetland over time. Accordingly, the trial court's finding was not clearly erroneous, and it plainly supported its conclusion that restoration was necessary to protect the public's interest in preserving wetlands under the statute. See *King*, 303 Mich App at 185.

Next, the trial court found that defendants' violation of the statute was not intentional and acknowledged defendants' argument that restoration was unwarranted since the filled area had been improved because they "creat[ed] an upland area inside this wetland" that included various forms of wildlife. The court, however, concluded that such a consideration was not relevant to whether restoration is proper in this case, explaining, "I think what it comes down to is the Act has to be enforced. There's no provision in there that . . . says that it's all right for me to fill in a wetland if it's going to improve it." The trial court's conclusion that this fact weighed in favor of ordering restoration, regardless of defendants' intent, is supported by the statute, see MCL 324.30316, and was not outside the range of principled outcomes. See *Ypsilanti Charter Twp*, 281 Mich App at 273.

The trial court then determined that the parties' potential settlement discussions regarding

-17-

the possibility of a "conservatory easement" were not relevant to its determination of whether restoration was proper. It also acknowledged the contradictory testimony regarding the prevalence of narrow-leaf cattails in the filled area, and whether that type of cattail constituted an invasive species that is harmful to the wetland. It ultimately concluded that it "was not convinced that there was really an invasive species issue either."

On appeal, defendants argue that because the filled area was previously dominated by narrow-leaf cattails, a nonnative species, it was improper for the trial court to order them to restore the area with native species, thereby making "the filled wetland better than it was before." However, it is important to note that neither of the parties were certain as to which species were present in the wetland before it was filled, and there was conflicting testimony provided by defendants' expert and plaintiff's experts as to whether the area was previously dominated by narrow-leaf cattails and whether such cattails are harmful. Martin, defendants' expert, testified that the filled area was dominated by narrow-leaf cattails based on her review of aerial photographs and her observations of the surrounding wetlands, although she thought there were "probably" other wetland species present. Plaintiff's experts testified to the contrary, opining—based on aerial photographs, wetland samples, and other evidence—that the filled expanse was "a pretty diverse area" including "a number of different habitat types," such as "large patches" of cattails as well as a mixture of assorted vegetation, including one section "dominated by shrubs." There also was conflicting testimony about whether narrow-leaf cattails would be problematic to the restoration project or would render the restoration project futile. However, in determining whether a finding was clearly erroneous, we must give deference "to the trial court's superior ability to judge the credibility of the witnesses who appeared before it." *Ambs v Kalamazoo Co Rd Comm'r*, 255 Mich App 637, 652; 662 NW2d 424 (2003); see also MCR 2.613(C). Given the factual disputes below, the trial court's finding that there was not "an invasive species issue" was not clearly erroneous. See *King*, 303 Mich App at 185.

Furthermore, the trial court had the authority to order defendants "to restore as nearly as possible the wetland that was affected by the violation to its original condition immediately before the violation." MCL 324.30316(4). Given the uncertainty regarding the wetland's original condition, the trial court did not exceed its authority under Part 303 by ordering defendants to "[r]e-establish wetland vegetation in the restoration area by applying a DEQ-approved native wetland plant seed mix and planting native Michigan species of wetland shrubs."

Next, the trial court determined that the wetland had been "compacted," and found that this fact was relevant to its consideration of whether the fill material should be removed. At trial, defendants' counsel expressed doubt regarding Smith's testimony on behalf of the DEQ that there were two to three feet of fill material throughout the filled area, based on the fact that only two soil borings were conducted within the area. However, plaintiff's witnesses provided clear testimony regarding the depth of the fill and the heavy fill material that made further soil boring impossible. Thus, the court's finding on this matter was not clearly erroneous. See *King*, 303 Mich App at 185.

The trial court then noted that "[t]here was discussion concerning the statute of whether or not the loss of the wetland could deprive the state" of certain benefits, but the court "did not consider those to be requirements . . . because it was undisputed that the property had already

-18-

been designated as a wetland." The statute to which the court was referring is MCL 324.30302, which sets forth the Legislature's findings regarding wetland benefits. The experts who testified in this case disagreed regarding the benefits that the filled area previously provided, but the trial court seemed to presume that the wetland provided one or more of the benefits identified by the Legislature because the area already had been designated as a wetland. Nonetheless, given the fact that both parties acknowledged that the filled area provided *some* benefit, even though they disputed the types of benefits and the extent of the benefits, the trial court did not clearly err in concluding that restoration of the wetland would be beneficial given its designation as a wetland. See *King*, 303 Mich App at 185.

However, defendants argue on appeal that the trial court should have considered the specific effects of the filing on the surrounding wetland complex. Specifically, they contend that "the wetland complex in which [they] placed fill dirt is not rare or imperiled, the fill has not affected any endangered or threatened species, and has not materially lessened the capacity of the wetland complex to function."[12] Likewise, they assert that restoring the filled area would impose a disproportionate burden on them because "the placement of fill dirt on 1½ acres to make this pasture . . . has not had any significant impact on the 145[-]acre wetland complex." Defendants rely on the wetland assessment report—prepared by their expert using methodology that had not previously been used to analyze a filled wetland area that was not observed prior to the filling—which concluded that restoration of the wetland would not materially improve the benefits provided by the entire 145-acre wetland complex. To the contrary, Kolhoff testified on behalf of the DEQ that "the fill eliminated the wetland . . . . It's gone; it was a functioning wetland that was ponded. It had habitat value; it possibly had storm water value, it had water storage, water recharge, pollution control value and those values are gone." Kolhoff conceded that the area was "a small part of a larger complex," but explained that "it occupied a unique location compared to the rest of the wetland complex and it provided a different function than the remaining wetland would." He also noted that this case involves "a significant fill as far as a permit issue is concerned," because an "acre and a half is a substantial impact" for purposes of issuing permits or reviewing violations. Consistent with his testimony, it was undisputed that more than one acre of wetland was filled, which constitutes "a major project" for permitting purposes. See MCL 324.30306(3)(c)(*i*). Thus, on this record, the trial court was justified in concluding that restoration was warranted, and this conclusion was not outside the range of principled outcomes. See *Ypsilanti Charter Twp*, 281 Mich App at 273.

Furthermore, the trial court expressly recognized the burden that restoration would place

---

[12] MCL 324.30301(k), as amended by 2009 PA 120, identifies various wetland types as falling within the "rare and imperiled wetland" category. Although whether a wetland was "rare and imperiled" may seem significant, the phrase only appears in one other Part 303 section, MCL 324.30304b, which pertains to permits issued by the United States Army Corps of Engineers. MCL 324.30304b(1)(b)(*i*). Moreover, there was conflicting testimony regarding whether the area at issue previously was a rare and imperiled wetland as an "inundated shrub swamp," and Kolhoff testified that "scrub-shrub areas like that typically can house a number of threatened or endangered or imperiled species."

-19-

on defendants, but weighed this fact against the potential precedential effect of allowing defendants to destroy a wetland and expand their usable property without any recourse:

> So I understand that that leaves the [defendants] in a difficult spot in that the property has been filled, [sic] there's the cost associated with reclearing the property[,] but if I did not order restoration that means that the [defendants] would in essence add an additional property to their land by filling this wetland.

Likewise, it later stated, "The Court is . . . cognizant of the impact of this decision[,] but I believe that for the precedence value the Court cannot say that the [defendants] should not have to restore the property in this matter." In so stating, the trial court implicitly recognized plaintiff's and the public's interest in ensuring that violations are remedied and prevented, and that individual citizens are not incentivized to violate the law, and infringe upon the public's interest in preserving wetlands, in light of a likelihood that their actions will not be punished.

In sum, the trial court's findings were not clearly erroneous, as it necessarily had to make credibility determinations given the conflicting evidence. See MCR 2.613(C); *Ambs*, 255 Mich App at 652. Under the circumstances, the restoration order was not an abuse of discretion, as the court's ruling was not "outside the range of reasonable and principled outcomes." *Ypsilanti Charter Twp*, 281 Mich App at 273.

### 2. DEFENDANTS' ADDITIONAL ARGUMENTS REGARDING THE RESTORATION ORDER

Defendants argue that this Court should consider factors identified in cases applying the Michigan Environmental Protection Act ("MEPA"), Part 17 of the NREPA, MCL 324.1701 *et seq.*, to determine whether the restoration order was warranted in this case. See *Kernen*, 232 Mich App at 507. The MEPA provides, in relevant part, that

> [t]he attorney general . . . may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction. [MCL 324.1701(1).]

Because "virtually all human activities can be found to adversely impact natural resources in some way or another," factors were developed to determine "whether the impact of a proposed action on wildlife is so significant as to constitute an environmental risk and require judicial intervention." *City of Portage v Kalamazoo Co Rd Comm'r*, 136 Mich App 276, 280-282; 355 NW2d 913 (1984). See also *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 31; 576 NW2d 641 (1998); *Preserve The Dunes, Inc v Dep't Of Environmental Quality & Technisand, Inc*, 264 Mich App 257, 262 n 3; 690 NW2d 487 (2004). The MEPA factors identified by defendants "are not mandatory, exclusive, or dispositive," *Preserve the Dunes*, 264 Mich App at 262 (quotation marks and citation omitted), and they were developed given the need for "the courts to give precise meaning to" the statutory language of Part 17 of the NREPA, *Portage*, 136 Mich App at 281-282. Because those factors were developed without considering the statute at issue in this case, MCL 324.30316, we must refrain from deviating from the clear text of the statute

and interjecting judicially crafted meaning into the words written by the Legislature and signed into law by the Executive. See *Huggett*, 464 Mich at 717. Accordingly, we decline to consider those factors, and we cannot conclude that the trial court abused its discretion by failing to consider those elements, especially because there is no legal authority mandating or suggesting their application in cases arising under Part 303. See *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010) ("[I]t is well established that we may not read into the statute what is not within the Legislature's intent as derived from the language of the statute.") (quotation marks and citation omitted); *In re Keyes Estate*, 310 Mich App 266, 272; 871 NW2d 388 (2015) ("When the Legislature includes language in one part of a statute that it omits in another, this Court presumes that the omission was intentional.").

Defendants also cite cases denying or reversing restoration orders under the federal CWA. According to one of the cases cited by defendants, the Eighth Circuit determines whether a restoration order is appropriate by considering whether the order

> (1) is designed to confer maximum environmental benefit, (2) is practical and feasible from an environmental and engineering standpoint, and (3) takes into consideration the financial resources of the defendant, and (4) includes consideration of defendant's objections. [*US v Huseby*, 862 F Supp 2d 951, 966 (D Minn, 2012).]

Again, while the trial court could have considered these factors when deciding whether to order restoration, it would be inappropriate for us to conclude that consideration of these factors is mandatory when determining whether a restoration order is warranted for purposes of Part 303 when the Legislature did not so restrict the trial court's discretion.

More generally, however, we reject defendants' reliance on federal law as a basis for reversal. In *Huggett*, the Michigan Supreme Court rejected this Court's reliance, in determining the scope of the farming activities exemption, on the "analogous, similarly worded" provisions of the CWA and its belief that the WPA was intended to "be consistent with, and at least as stringent as," the CWA. See *Huggett v Dep't of Nat Res*, 232 Mich App 188, 194-195; 590 NW2d 747 (1998). The Supreme Court stated, "[T]he Court of Appeals relied on federal law to reach its conclusion. Because we can discern the Legislature's intent on this question from the wetland provisions themselves, we need not concern ourselves with federal law in this case. For these reasons, we disagree with these aspects of the Court of Appeals opinion." *Huggett*, 464 Mich at 722 (citations omitted). Similarly, the Michigan Supreme Court noted in *Garg*, 472 Mich at 282, "While federal precedent may often be useful as guidance in this Court's interpretation of laws with federal analogues, such precedent cannot be allowed to rewrite Michigan law." There is no indication in the statute at issue that trial courts are required to consider specific factors before ordering restoration of a wetland, or that we are required to consider specific factors when reviewing a trial court's order of restoration on appeal. Accordingly, we reject defendants' reliance on federal caselaw in this case given the extensive

discretion[13] under MCL 324.30316(4) for the trial court to order restoration of the wetland.

## V. CIVIL FINE

Defendants next argue that the trial court erroneously ordered them to pay a $10,000 fine. Given the trial court's stated reasons for imposing the fine pursuant to MCL 324.30316(1), the extensive discretion afforded under the statute, and our standard of review, we cannot conclude that the trial court abused its discretion.

## A. STANDARD OF REVIEW

MCL 324.30316(1) states that "[i]n addition to any other relief granted under this section, the court may impose a civil fine[.]"  Again, "the term 'may' presupposes discretion and does not mandate an action." *In re Weber Estate*, 257 Mich App at 562.  Accordingly, we conclude that the trial court's imposition of a civil fine under Part 303 is reviewed for an abuse of discretion. See *Detroit Edison Co*, 311 Mich App at 385 n 8.

## B. ANALYSIS

In relevant part, MCL 324.30316(1) provides that "[i]n addition to any other relief granted under this section, the court may impose a civil fine of not more than $10,000.00 per day of violation."  As discussed above, defendants violated the NREPA by placing fill material in a wetland without a permit.  Thus, under Part 303 of the NREPA, the trial court was authorized to impose a maximum fine of $10,000 per day.

In its ruling on the record, the trial court first stated that plaintiff had requested the imposition of a $50,000 fine and expressly noted that the statute authorized up to $10,000 per day, "which is high."  The court then considered the fines that it had ordered in "some other cases . . . where there was of course just blatant disregard of the Department's orders and total lack of cooperation."  Accordingly, it determined that a total fine of $10,000 was appropriate in this case.  The court stated, "I think the violation occurred in 2008[,] [s]o we've got a lot of years there."  Accordingly, it concluded that it would characterize the fine as $2,000 per year from 2010 through 2015, presumably in light of the fact that defendants first received notice of their violation, and were first ordered to remedy the violation, in 2010.  In so reasoning, the trial court only considered a portion of defendants' ongoing violation of Part 303.  Additionally, when divided per diem, based on the limited time frame established by the court, the fine imposed was

---

[13] Notably, the Legislature specified numerous criteria for plaintiff to consider when determining whether to approve a permit for a prohibited activity under MCL 324.30304, including many of the factors advanced by defendants on appeal.  See MCL 324.30311.  The fact that the Legislature could have but chose not to provide such guidance for trial courts determining whether to undo prohibited activities in fashioning a remedy further suggests that a trial court has discretion.  See *In re Keyes Estate*, 310 Mich App at 272 ("When the Legislature includes language in one part of a statute that it omits in another, this Court presumes that the omission was intentional.").

only approximately $5.50 per day, as opposed to the $10,000 per day fine authorized by statute. Thus, the trial court's imposition of a fine of $10,000 in total was not an unprincipled outcome, especially, as defendants emphasize, in light of the lack of evidence that they acted in willful defiance of the law. See *Ypsilanti Charter Twp*, 281 Mich App at 273.

Defendants again rely on federal law to show that the fine was outside the range of principled outcomes, but this reliance is misplaced. Two of the cases cited by defendants, *US v Bay-Houston Towing Co, Inc*, 197 F Supp 2d 788 (ED Mich, 2002), and *Catskill Mountains Chapter of Trout Unlimited, Inc v City of New York*, 244 F Supp 2d 41 (ND New York, 2003), rev'd in part and remanded by 451 F3d 77 (2nd Cir, 2006), applied § 1319 of the CWA. Defendants focus on § 1319(d), which provides, in relevant part:

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require. [33 USC 1319(d).]

The Michigan Legislature did not direct courts to consider these such factors when imposing civil fines under MCL 324.30316(1), and we may not read such a requirement into the statute. Cf. *Garg*, 472 Mich at 282; *Huggett*, 464 Mich at 722.

In the other case cited by defendants, *US v Bradshaw*, 541 F Supp 880, 883 (D Maryland, 1981), the statutory section under which the government sought a civil penalty is not readily apparent. The district court simply determined that it was "unnecessary to impose any [civil penalties] because the [d]efendant immediately ceased his activities upon notice of a possible violation." *Id*. Here, however, the trial court had the discretion to reach the conclusion that it did. Notably, the statute at issue, MCL 324.30316(1), does not limit the trial court's discretion by preventing it from imposing a fine in situations where the violators immediately ceased their illegal activities, as defendants claim they did. Further, even if defendants did cease their illegal activities, they failed to remedy their violation before the DEQ initiated this action seeking restoration of the wetland and other relief, which was three years after the DEQ first notified them of their violative activities.

We also disagree with defendants that the penalty-related provisions in the Michigan Department of Environmental Quality Land and Water Management Division Compliance and Enforcement Guidance Manual admitted below establish that the trial court abused its discretion in this case. As previously explained, there is no evidence indicating that the manual constitutes a guideline that is binding on plaintiff.[14] Likewise, there is no indication in the statute that the Legislature intended for the trial court's discretion to be limited by any provisions in a compliance manual, assuming that it was in effect during the events at issue in this case.

---

[14] See the discussion in footnote 9.

## VI. CONCLUSION

Defendants have failed to establish that any of their claims raised on appeal warrant relief.

Affirmed.

/s/ Michael J. Riordan
/s/ Patrick M. Meter
/s/ Donald S. Owens